# 12 CV 05409

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

                                    :

Benula Bensam,                           :

                                    :

             Plaintiff,                :                   COMPLAINT

                                    :

-against-                             :                  Jury Demanded

Preetinder Singh Bharara, individually and officially;:

Reed Michael Brodsky, individually and officially;   :

Richard Craig Tarlowe, individually and officially;   :

United States Department of Justice;             :

United States Marshal Service;                   :

U.S. Marshals Jane Does no. 1, 2, Joe Does no. 1, 2, 3:

 individually and officially;                     :

AKAL Security Service Inc.;                    :

The United States.                          :

                Defendants.                          :

------------------------------------------------------------------X

## Defendants

1. Preetinder Singh Bharara is the U.S. Attorney General for the Southern District of New York. He oversaw the trial of Rajat K. Gupta and occasionally attended the proceedings. He may have instigated the involvement of the U.S. Marshals.

2. Reed Michael Brodsky is an Assistant U.S. Attorney and was a prosecutor in the Gupta trial. He knew of the letters I had written to Judge Rakoff. He may have instigated the involvement of the U.S. Marshals.

3.Richard Craig Tarlowe is an Assistant U.S. Attorney and was a prosecutor in the Gupta trial. He knew of the letters I had written to Judge Rakoff. He may have instigated the involvement of the U.S. Marshals.

4. U.S. Marshals at the Southern District in Manhattan, Jane Does no. 1, 2, and Joe Does no. 1, 2, 3  (and any other U.S. Marshals involved) conducted a search and seizure in violation of the Fourth Amendment pursuant to 42 U.S.C. §1983.

5. U.S. Marshals Service is held responsible under Respondeat Superior.

6. U.S. Department of Justice is held responsible under Respondeat Superior for the actions of the attorneys named above and the U.S. Marshalls.

7. AKAL Security Inc. (7 Infinity Loop.  Espanola, New Mexico  87532) currently holds the contract for providing court security officers for the Second Circuit which includes the Southern District of New York in Manhattan. AKAL is responsible under Respondeat Superior for the tortious actions of the court security officers in the Manhattan District Court and for their breach of the Duty of Care in Trust.

8. United States Government is held responsible for the torts committed by the court security officers and for their breach of the Duty of Care in Trust (or alternatively, under the theory of Contracts). Procedures were lacking in separating the U.S. Marshals and the Court security officers in Southern District of New York in Manhattan.

## Jurisdiction

9. Claims relate to 42 U.S.C. §1983 and 28 U.S.C. §1346.

## Venue

10. The incidents giving rise to this case occurred in the Southern District Court in Manhattan.

## Statement of Facts

11.     I, Benula Bensam, began attending trial hearings on the Rajat Gupta case in Federal District Court, over which Judge Rakoff presided, on May 22, 2012. I attended anticipating gaining litigation skill from observing what was described in the newspapers as a circumspect case in terms of evidence, tried by rising star prosecutors, a reputed defense attorney, and an exacting judge. I wanted to understand the process of litigation and having taken a course on the Federal Rules of Evidence, I expected to follow the case on a general level. A primary motivation was to become familiar with the operations of the financial markets and of banking. Judge Rakoff is known to be assigned cases in this field; the Gupta case was currently on his calendar although it was a white-collar case on insider trading.  To keep focused and diligent on my task, I maintained regular online posts on the trial.

12.     On the morning of Friday May 25, 2012, I approached Court security officers stationed at Judge Rakoff's courtroom with a letter addressed to Judge Rakoff. It was not in an envelope and

not sealed in any way or folded, but open, printed on a single page so as to be read by anyone. I asked if it could be delivered to the Judge. The heading of the letter included its subject matter ("Re: William W. George and "Confidential" information"). The letter was regarding the definition or nature of "confidential" information. It had been an evidentiary issue that the Judge had pondered aloud during the previous day's hearing. Sitting in the area was Stephanie Cirkovich, Esq., the Public Information Officer, who kindly asked to the see the letter I was holding, that perhaps she may be able to help. I handed her the letter and she skimmed it before I left to take my place in the line that had formed outside of the courtroom.

13.    Stephanie Cirkovich, Esq., Public Information Officer, soon thereafter approached me in the queue and said it might be better to send the letter through the mail, that is, through the security downstairs so that I may receive a record that it had been received. I explained that I am not representing any party in the case and that I did not need a record of receipt. Cirkovich replied that she may not be able to get the letter to the Judge and to this I said that it did not matter much. Later in the day, she informed me that she was able send the letter and gave me her business card saying that if I encountered any problems, to contact her.

14.    On Wednesday May 30, 2012, I asked Stephanie Cirkovich, Esq., Public Information Officer, if she would be able to give another letter to the Judge. As before, this second letter was not in an envelope, I held it open to her so that it could be read, and it had a subject matter reference in the title ("Re: Co-conspirator theory"); it was regarding an evidentiary issue. But unlike the first letter which was computer printed, this was handwritten. I apologized for disturbing her and said that next time I will send the letter through security in the lobby. As before Cirkovich said that the letter might not be able to be delivered, and as before I replied that it did not matter.

15.     Some time later but before Monday June 4, 2012, Stephanie Cirkovich, Esq., Public

Information Officer, told me during a regular break in the hearings that, whether I decide to send

letters through the mail or not, perhaps I should not send letters because it may influence the

judge. She added that it wouldn't occur here because Judge Rakoff is a "professional". She

continued that the Judge likely did not read the letters and that he would be too busy to do so. I

asked whether Judge Rakoff had said this. She replied that it was coming from her ("me").

16.     Stephanie Cirkovich, Esq., Public Information Officer on this same day, asked if I can

give her my contact information for her personal reference. I replied that I did not have a

business card but that I can write down my information for her. I took her pen to write on a paper

that she held when she complimented my handwriting. I took this to mean the handwriting on the

second letter to Judge Rakoff as I was only about to write down my contact information, or had

just begun to write. I disclosed to her that I am a student attending law school, and gave the name

of the school I attend.

17.     On the morning of Monday June 4, 2012, I gave a letter, the third letter addressed to

Judge Rakoff, to the security in the lobby where it was screened through an X-ray machine and

stamped. This letter, unlike the first two was in a sealed envelope because security in the lobby

do not accept letters that are not in an envelope. Like the second letter, this third letter was

handwritten and like all the letters, it had a subject line in the title ("Re: Expectation of a

benefit"). The envelope was addressed to Judge Rakoff and indicated Courtroom 14B in my

handwriting.

18.     That same day, Monday June 4, 2012, in the evening, as I was sitting in the gallery of

courtroom 14B, listening to the testimony of a witness, a wallet opened to a badge and ID was

held out in front of me and Jane Doe no. 1 identified herself as a "U.S. Marshal". She asked to speak to me. I replied "sure" and followed her out to the hallway. I, thinking it unlikely that the U.S. Marshals will call upon me for any reason, did not fully apprehend that she was a U.S. Marshal and thought it was only court security or some court personnel.

19.     As soon as I stepped out of the door to courtroom 14B and into the hallway, Jane Doe no. 1 became accusatory and confrontational. There were two other U.S. Marshalls in the hall (John Doe no. 1, and Jane Doe no. 2). There was no one else in the halls; court security was seated in the area between the doors to the hallway and the doors to where the trial was ongoing. Jane Doe no. 1 held up a letter and an open envelope that looked to be the envelope I had left with court security officers (CSO) in the morning. My attempts to explain a possible misunderstanding was deliberately manipulated by Jane Doe no. 1. Seeing that Jane Doe no. 1 was being baiting and that my attempts to clarify any misunderstandings would be of no avail, I said that perhaps the police should be called (I still was not fully aware that this was the U.S. Marshalls). Jane Doe no. 1 replied 'We are the police. We're the U.S. Marshalls' or something very close to those words. Coming to this realization, I asserted that I did not need to answer their questions and went to open the door to courtroom14B. As I reached for the door knob with my right hand, I felt the left arm being drawn in the opposite direction. It was Jane Doe no. 1 and she asserted that I can not return unless I answered the questions, that otherwise, I must leave. I replied then that I will leave but that I had to retrieve the things I had left at my seat. I went into the courtroom and returned with my bag.

20.     At some point in the hallway of the 14th floor, one of the Marshals was on the phone with someone who sounded to be their supervisor or at least from whom the Marshals seemed to want me to think was giving orders.

21.    The U.S. Marshalls demanded I show them my ID.

22.    I went downstairs to the security station at the lobby's main entrance and handed my token or coin to a Court security officer to retrieve my cell phone. All phones, unless there is special allowance, had to be turned off and left with the CSOs. The three U.S. Marshalls had come down to the lobby as well and Jane Doe no. 1 yelled out that I can not get my phone unless I show ID. A CSO handed my coin/token to Jane Doe no. 1. Having the coin in hand, Jane Doe no. 1 declared that the coin was for the security station at the other end of the building. I had forgotten that that morning, unlike my previous practice, I entered through the back ("North" or "Worth Street" entrance) entrance (in fact, it is the back entrance where letters and mail is received). I demanded that the coin be returned to me. Jane Doe continued that I give ID and I replied that I will not. I demanded to the U.S. Marshalls that my phone be returned. John Doe no. 1, U.S. Marshall, began to focus a phone camera to take a picture of me but I walked to the other end of the building. To a CSO stationed in the back end security station, I said that I would like to get my cell phone but that they, pointing to a short distance where the three U.S. Marshalls stood, had my coin. This security guard replied, "U.S. Marshalls" and said that he could do nothing.

23.    The three U.S. Marshalls approached me as I stood by this CSO whom I had just spoken to. I demanded again to the U.S. Marshalls that my phone be returned and that the coin be returned. Again the U.S. Marshalls refused. I saw that John Doe no. 1 was again trying to focus the camera phone. I declared that they can not take a photo of me, that they have no consent from me to do so.  I looked down at the camera phone's screen and saw that a side photo of me had been taken. I made demands that the photo be deleted.

24.     Seeing that the U.S. Marshals would not return my phone, I thought the best I can now do was to get to my law school where I had just completed my second year and see my Criminal Law (and Criminal Procedure) Professor. I left the courthouse and saw the three Marshals looking out at me from one of the large windows in the court's lobby. This encounter with the U.S. Marshals had lasted for a half an hour to an hour.

25.     At the law school however, the building was largely empty and my Criminal Law Professor was not there. I returned home having determined that I would return to the courthouse the next morning.

26.     The next morning, Tuesday, June 5, 2012, I did return. On this day the Gupta trial was not being heard as Judge Rakoff explained that he had a pre-scheduled obligation. I kept in mind that if my phone was returned, that I should be careful to check whether the phone had been turned on, as I had turned off the phone when I left it at the security station the previous morning.

27.     I went to the back entrance where I asked the Court security officer for my phone and was directed to go to the front entrance security station where someone, I understood it to be a supervisor, may be able to assist. CSO at the front station said that I needed to show ID. They said that they did not have the phone with them. They remembered what had occurred with me and the U.S. Marshals from yesterday. I said that perhaps a supervisor would be better able to assist and a CSO dialed someone on the phone. He stated, apparently for me to hear as well, that I would not show ID, he related his physical description of me and said that I must have done something to bring upon myself this treatment. A supervisor to the CSOs came to where I stood at the security station and asked if the people behind him were the people who had hassled me.

In reply I demanded that I wanted to speak to them. This CSO stepped aside and I demanded to the U.S. Marshals standing at the doorway of the security station that my cell phone be returned. I observed that John Doe no. 1, U.S. Marshal, was amongst this party. I also remember seeing a glance of Jane Doe no. 1. There were also other U.S. Marshalls in the group apart from the two new Marshals that now spoke to me (John Doe no. 2, and 3). One, either John Doe no. 2, or 3 asked that my ID be shown. I asserted strongly that they had "no right to ask for" my ID and demanded that my "property" be returned. John Doe no. 2 held out his palm with my cell phone on it. My flip phone was right side up with the top part of it closest to me. I took it.

28.     As I had reached to take my phone from John Doe no. 2, John Doe no. 3, whom I remember to be one of the taller U.S. Marshals, had held up a camera phone and as soon as I had taken my cell phone, a flash came on. I then proceeded to demand that the photo taken be deleted. I declared that they had taken a photo of me as a condition for returning my phone. John Doe no. 3 asked that if that was not true, that had he not take a picture of me after I was returned my phone. I pointed to John Doe no. 1, who stood as if wanting to be unnoticed against a wall and who had taken a photo of me the day before, declaring "he did".

29.     At a point in the encounter when I felt I could carefully check, I opened the flip phone to see if it had been turned on. The screen showed the home screen and I knew that it had been earlier turned on.

30.     Thinking I should be careful to assert all my privileges, I stated to the U.S. Marshals that they should get me an attorney but was told I would have to do that on my own by U.S. Marshal, John Doe no. 3. I remained where I stood. John Doe no. 3 asked if I would not like to speak to him outside. He walked away expecting me to follow him out but I continued where I was. John

Doe no. 2 nudged me on my left arm to follow John Doe no. 3 out and I walked outside of the front doors. John Doe no. 2 and 3 stood together outside of the front doors and atop the front stairs. I also stood here, somewhat apart, thinking what I must now do.

31.    Some people were entering the courthouse and I called out to them that "if you leave your phone with security, the U.S. Marshals may not return it". One particular person stopped, she asked something which I took to be "who?" and I replied "U.S. Marshals" pointing to the U.S. Marshals John Doe no. 2 and 3. I said conversationally, that it had been my experience. John Doe no. 3 commented that this can not continue and said to me that I can not protest at the courthouse and giving an acronym of what sounded as some security or police force, said that he would have to call them. I replied that then I would go outside of the courthouse's bounds.

32.    I paced the sidewalk and the street outside the main entrance of the courthouse and continued to call out to people looking to enter. I specifically sought the attention of attorneys thinking that they may take more concern in it, calling out "Attorneys, Do not leave your phones with security because U.S. Marshals might refuse to return it like they did to me."

33.    I continued pacing and calling out to people but there were not many and it seemed not to be of any concern to most. U.S. Marshal, John Doe no. 3 came down to where I was walking to-and-fro and said that I should go and asked if I wouldn't want to come see the trial tomorrow. I did not reply but instead of pacing back, I continued to walk to the back of the courthouse. John Doe no. 3 may have thought that I was leaving but in fact I thought that as the back entrance is sometimes designated for attorneys, I may have a better effect at the back entrance in relating that people be aware. However, there was nearly no one entering this back entrance. I returned to the front entrance and continued to call out to people. The U.S. Marshals were nowhere in sight.

I soon thereafter left. This whole incident, including my peripateticism outside the courthouse lasted for about an hour.

34.     Wednesday June 6, 2012, I returned to watch the trial. In fact, I returned with a fourth letter meant to inform Judge Rakoff of the confrontation with the U.S. Marshals. It did not relate to the Gupta trail. As I was suspicious of any information gathering of personal data by the U.S. Marshals, I did not identify myself in the letter. It was typed, and placed in a sealed envelope for it to pass through the security station. However, the Court security officers refused to take the letter without a return address on the envelope even as I expressed my wish that the letter to be anonymous. So, I kept the letter with me and it was never sent to Judge Rakoff.

35.     That day, June 6, 2012 during the morning break, when the jury had left the room, I was called by a court staff member to a sidebar where the Judge, the two prosecutors, two defense attorneys, the court clerk and the court reporter stood. Judge Rakoff related to me that I must take caution against changing the outcome of the case. This was the first time I had spoken with Judge Rakoff and he at no point prohibited letters, still I understood them to be not well received. When he asked of what occurred the day before, I said that I had returned because the U.S. Marshalls had refused to return my phone and that they had taken photos of me over my objections, that they did not delete them when I asked them to do so. Judge Rakoff expressed surprise and said that he was not aware of this. I could not outline everything that occurred in detail to Judge Rakoff at this sidebar because I had made myself refocus my attention away from the episode with the U.S. Marshals as I had other things to attend to and could not continuously reflect on past events (In answering Judge Rakoff, I referenced a class lecture on abortion and women's rights but in fact the unit was on contraception and the Professor had explicitly stated

that the issue is not one of women's rights and that we would not be covering abortion; At the moment, I recounted exactly what my Professor had disclaimed).

36.     On Monday June 4, 2012, after the first day's encounter with the U.S. Marshalls, seeing how any personal information may be manipulated against an individual, I deleted all the online posts I had published on the Gupta trial and discontinued further posts on it.

37.     At no point had anyone informed me that I must not direct letters about the ongoing trial, or about the evidentiary rules, or about any other matter, to Judge Rakoff.

38.     Preetinder Singh ("Preet") Bharara is the U.S. Attorney General for the Southern District of New York. He oversaw the trial of Rajat K. Gupta and occasionally attended the proceedings. He has advocated the use of intrusive surveillance such as wiretaps for the prosecution of his cases. Accordingly, he has no qualms about government command over individuals, opting to ploy large-net tactics than taking precautions.

39.     Reed Michael Brodsky and Richard Craig Tarlowe are Assistant U.S. Attorneys and were prosecutors in the Gupta trial. They knew of the letters I had written to Judge Rakoff.

40.     U.S. Marshalls have permanent, or near permanent, stations in the Southern District Courthouse in Manhattan. This affords interaction with attorneys who frequent the courthouse to litigate claims.

## CLAIM I

41.     42 U.S.C. §1983 Unreasonable search and seizure for unlawful stop, detention, interrogation, seizure of property, search of property, search of communications, demand for identification etc. by the U.S. Marshals, U.S. Attorney Preet Bharara, Assistant U.S. Attorney

Reed M. Brodsky, and Assistant U.S. Attorney Richard C. Tarlowe and the Department of Justice by respondeat superior for the actions of the U.S. Marshals and that of the attorneys above named. The U.S. Marshal Service is also responsible by respondeat superior.

42.     No Executive agency may intercept or intervene in any way the communications to a member of the Judiciary on the subject of a trial. The violation of the separation of powers in censoring the information available to a Judge is most particular when an Executive agency is party to the trial. The forceful censure by an Executive agency of a person who writes non-threatening, individually addressed letters to a Judge, on a case which an Executive agency has brought, is an extreme that only serves to suppress engaged citizenry and allow rank abuse for vainglory by people in the Executive. The involvement of the U.S. Marshals in this matter is per se "unreasonable".

43.     Furthermore, it is not a crime for a disinterested party to write letters to a Judge on the subject of a trial.

## CLAIM II

44.     42 U.S.C. §1983 Unreasonable search and seizure for unlawful stop, detention, interrogation, seizure of property, search of property, search of communications, demand for identification etc. by the U.S. Marshal Service by respondeat superior.

45.     The U.S. Marshals are to be held responsible for actions taken by court security officers for their role in the seizure of my phone and their questioning and comments made on Tuesday June 5, 2012. There was a lack of procedure to distinctively separate between the services of the court security officers and U.S. Marshals. The actions of the court security officers show that

they overfamiliarly associate themselves with the U.S. Marshals and evinces their willingness to work in concert with them.

## CLAIM III

46.     Court security officers tortiously gave the token receipt and my cell phone to the U.S. Marshalls.

## CLAIM IV

47.     Court security officers breached the Duty of Care owed to court attendees who leave electronic equipment containing sensitive or personal information with them in trust.

48.     The Court security officers voluntarily gave the token receipt and my cell phone to the U.S. Marshals. They also acted on behalf of the U.S. Marshals in refusing to return my cell phone without meeting the U.S. Marshals' demand to produce identification and in attempting to abet me into disclosing information about myself for the benefit of the U.S. Marshals.

49.     Members of the press and attorneys leave electronic files with Court security officers in confidence that they will remain secure. These files contain information that, if disclosed to unscrupulous parties, would obstruct important service to the public and undermine the foundations of a democratic republic. The trust placed on court security officers is to be expected and also extends to members of the general public who are impressed with the courthouse as a space where protection is ensured.

## CLAIM V

50.     The United States is held responsible pursuant to 28 U.S.C. §1346 for the tortious actions of the court security officers (Claim III) where it is found that procedures were lacking in separating the offices of the U.S. Marshals and the Court security officers.

## CLAIM VI

51.     The United States is held responsible for the actions made in breach of Duty of Care by the court security officers (outlined in Claim IV) where it is found that procedures were lacking in separating the offices of the U.S. Marshals and the Court security officers. Alternatively, the United States is held responsible under the theory of Contracts pursuant to 28 U.S.C. §1346 for the account related in Claim IV.

## Remedy

52. Collection of personal electronic devices should be ordered stopped and other less compromising means may be adopted for ensuring no disruptions in the courtrooms.

53. Any and all information collected on me should be ordered expunged. An accounting of all information collected on me and the means of its procurement should be ordered given to me.

54. All court fees and attorneys fees.

55. Any and all relief that the Court may deem appropriate.

Benula Bensam

Plaintiff

44-34 64th St.

Woodside, New York 11377

(718) 650-1901

*Benula Bensam*

Signature

Date of signing: *July 10, 2012*